David S. Gingras, #021097
**Gingras Law Office, PLLC**
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
Fax: (480) 248-3196
David@GingrasLaw.com

Attorney for Plaintiff
KC Turbos, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| KC Turbos, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Turbo Charger Systems, Inc., an Oregon corporation; Kent R. Barnes, Jr., and Cherrelyn Barnes, husband and wife,<br><br>Defendants. | Case No. 24-cv-00235-MTM<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**1.) LANHAM ACT FALSE ADVERTISING; 15 U.S.C. § 1125(a)(1)(B);**<br>**2.) COMMERCIAL DISPARAGEMENT; AND**<br>**3.) UNFAIR COMPETITION** |

Plaintiff KC Turbos, LLC ("KC Turbos" or "Plaintiff") for its Complaint against Defendants Turbo Charger Systems, Inc. ("TCSI") and Kent R. Barnes, Jr. ("Barnes") alleges as follows:

**PARTIES**

1.  Plaintiff KC Turbos, LLC is a limited liability company formed under the laws of the State of Arizona.

2.  KC Turbos' principal place of business is located in Mesa, Arizona. KC does business nationally via its website located at www.KCTurbos.com.

3.  KC Turbos is a family-owned and operated company that has been providing high-quality turbochargers, turbo kits, and performance parts for diesel trucks and other vehicles since 2014.

4. Defendant Turbo Charger Systems, Inc. is a corporation formed and existing under the laws of the State of Oregon. TCSI is owned and operated by Defendant Kent R. Barnes, Jr. ("Barnes").

5. Pursuant to A.R.S. § 25–215(D), Defendant Cherrelyn Barnes is a necessary party to this action because the acts described herein were undertaken by Defendant Barnes for the benefit of the marital community with his spouse.

6. TCSI's principal place of business is located in Scappoose, Oregon, but it previously offered its products and services nationally via its website located at www.TurboChargerSystems.com. TCSI also markets and promotes its products and services on social media websites including Facebook.com.

## JURISDICTION AND VENUE

7. This is a civil action for false advertising under the Lanham Act, 15 U.S.C. §§ 1125, and for commercial disparagement and unfair competition under Arizona law. As to the Lanham Act claim, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over Defendants as Defendants have engaged in tortious conduct expressly aimed at Plaintiff in the State of Arizona, and which Defendants knew would cause harm, and which Defendants intended to cause harm, in the State of Arizona. *See Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) (holding, "operating even a passive website in conjunction with 'something more'–conduct directly targeting the forum—is sufficient to confer personal jurisdiction [in the forum state].")

9. Defendants are also subject to personal jurisdiction in Arizona because Defendants market and sell products to customers in Arizona, and the claims in this case arise directly from Defendants' forum-related contacts including Defendants' efforts to increase their profits by falsely disparaging Plaintiff in order to divert customers away from Plaintiff's products thereby increasing Plaintiff's sales and profits.

10. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims alleged in this Complaint occurred in this District.

## **FACTS COMMON TO ALL CLAIMS OF RELIEF**

11. KC Turbos is a well-known national leader focused on the development, marketing, and sale of parts and accessories for turbocharged vehicles and trucks. Based in Mesa, Arizona, KC Turbos employs a dedicated team of professionals who help select, test, and build parts and kits for use in the repair and upgrade of primarily turbo diesel truck and passenger vehicle engines.

12. Since its inception, KC Turbos has become a famous and well-respected name in the industry. In addition to its common-law rights, KC Turbos also owns a federally-registered trademark in the mark <KC TURBOS>, USPTO Reg. No. 5378920.

13. KC Turbos enjoys an outstanding reputation in the industry and is known as a reliable source for quality parts, service and support to customers across the United States.



1  14.  KC Turbos stocks and sells a wide variety of turbocharger parts and
2  accessories, including packages or "kits" containing carefully-selected parts for different
3  applications, some examples of which are shown here.



15. Some of the turbochargers sold by KC Turbos are branded as "KC" units, a typical example of which is shown below.



16. In addition to selling its own brand, KC Turbos also sells new parts from different manufacturers including, for example, Garrett, which is one of the most famous names in the industry, a typical example of which is shown below.



1    17.    Aside from brand-new units, KC also sells "remanufactured" turbochargers from a variety of original equipment manufacturers such as Cummins, a typical example of which is shown below.



18.    In every instance, all parts sold by KC Turbos are accurately labeled and described as either being a *new* part sold under the KC Turbos "KC" brand, a *new* part sold under the original brand name of the manufacturer (i.e., Garrett), or as a *rebuilt* unit, such as the case may be (i.e., Cummins).

19.    Over the last several years, Defendants Turbo Charger Systems and Barnes have sought to unlawfully interfere with the success of KC Turbos by posting false, misleading, inaccurate, and otherwise disparaging and/or defamatory statements on the Internet in commercial advertisements attacking KC Turbos, its products and practices. In doing so, Defendants have sought to cause confusion among relevant consumers in the hopes that by making false statements about KC Turbos, customers will choose *not* to buy parts from KC Turbos and instead, purchase competing products sold by Defendants.

20. A full inventory of all false, misleading, and disparaging statements made by Defendants regarding KC Turbos would be too voluminous to catalogue here, and would exceed the "short and plain" statement required by Fed. R. Civ. P. 8(a)(1). As such, only a small number of representative examples are offered.

21. For example, Defendants have repeatedly published statements on social media such as the example shown below. In this statement, Defendants make numerous false representations about both KC Turbos' products and Defendants' own products.

**EXAMPLE 1**

> If you want a $300 turbo from China that he charges $1500 for at 400% markup and you wait 4-6 weeks for? Well then KC is your man
>
> If you want a good turbo built in American soil
>
> Then I'm your man
>
> You decide

22. Specifically, Defendant Barnes represented that rather than assembling or reselling quality products under its own brand or the brands of other well-known manufacturers, KC Turbos simply purchases cheap ($300) turbos from China which it resells without any modifications for $1,500. These representations are completely false.

23. In addition, Defendant Barnes' statement above implies—falsely—that all turbochargers sold by Defendants are "Made In America" (i.e., "built in American soil"), and that products sold by KC Turbos are not made in America. In reality, turbochargers

7

1  sold by both Plaintiff and Defendants are, in many instances, "assembled" in America
2  using some parts from American-based manufacturers and some parts from non-US
3  sources including China, Japan, and elsewhere.

4  24.  To the extent Defendants' statement implies that Defendants' products contain
5  no foreign components and that such products only contain parts made in the United
6  States, those claims are completely false.

7  25.  To the extent Defendants' statement implies Plaintiff's products contain no
8  parts made in America, those claims are completely false.

9  26.  In another example, Defendant Barnes has repeatedly published commercial
10 statements making false comparisons between his products and those sold by KC Turbos,
11 such as those shown in Example 2 below.

**EXAMPLE 2**

> 1. KC Turbo price for a 64.7 mm 6.0
> Price: $1500 (you pay shipping)
> 2. EGTS up at 1400 degrees
> 3. My PMK2 64.7 mm 6.0 turbo
> Price: $1200 (with shipping covered)
> 4. EGTS will not exceed 1100 degrees
> (loaded with the longest trailer and the
> heaviest load you can legally run).
> 5. Straight out of the customers mouth.
> 6. How about them
> Apples? 💥

26  27.  In this statement, Defendant Barnes falsely represented that Plaintiff sells a
27 specific part for $1,500 plus the cost of shipping, while the same part is offered by
28 Defendants for $1,200 with free shipping. These representations are both false (because

8

1 Plaintiff does not sell the specific part listed) and because Plaintiff generally offers free ground shipping on those parts it does sell.

28. In addition, in Example 2 above, Defendant Barnes falsely stated a specific part sold by KC Turbos would operate at EGTS (exhaust gas temperatures) of 1,400 degrees Fahrenheit while the same part offered by Defendants would operate at a much lower EGTS that would not exceed 1,100 degrees even under the harshest operating conditions.

29. In the context of the turbo diesel market, exhaust gas temperatures are an extremely important measure of engine performance.

30. For example, it is common knowledge among consumers in the industry that a higher EGT is generally bad for engine and turbocharger longevity, and that all else being equal, a lower EGT is more desirable than a higher EGT.

31. In addition, it is common knowledge among consumers in the industry that an EGT of 1,400F or above is viewed as unsafe for any extended operation. A typical explanation of the reasons for this are reflected in technical articles such as this:

> So the big question is, what constitutes excessive EGT? If everything is working properly, 1250° to 1300° F. is a safe turbine inlet temperature, even for sustained running, mile after mile. Above 1300° F. things can start to get edgy. Remember, excessive EGT damage is cumulative. <u>Over 1400° F., you're usually gambling against a stacked deck and it's only a matter of time until you lose</u>. The higher the EGT, the shorter that time will be.

https://official.bankspower.com/tech_article/why-egt-is-important/ (emphasis added).

32. Defendants' false representation that their turbocharger products would *never* exceed an EGT of 1,100F and that KC Turbos' products would *always* operate "up at 1400 degrees" is a material misstatement about the quality of the parties' products which Defendants knew would have a substantial impact on the buying decisions of a typical consumer in this market.

9

33.     In another example, such as Examples 3, 4 and 5 shown below, Defendant Barnes has published statements claiming—falsely—that KC Turbos sells "counterfeit" products and, in addition, that KC Turbos has "copied" or "stolen" designs originally created by Barnes. Both of these representations are completely and totally false.

**EXAMPLE 3**



**EXAMPLE 4**



**EXAMPLE 5**

34. Defendants' statements to the effect that KC Turbos sells "counterfeit" or "knockoff" parts is totally and completely false. As noted above, KC Turbos sells hundreds of different parts, all of which are accurately labeled as either a "KC" branded part, a new part from a different manufacturer, or a rebuilt/remanufactured part. In no instance has KC Turbos ever sold a part which was not truthfully and accurately identified and branded according to that part's source or origin.

35. In a final example of Defendants' malice towards Plaintiff, Defendant Barnes recently created a completely false post shown in Example 6 below.

**EXAMPLE 6**



36. In this post, Defendant Barnes purported to show a product allegedly sold by KC Turbos. The images in question showed a turbo unit wearing the "KC" brand sitting in an open cardboard box with "USPS Priority Mail" text. The image showed part of the turbo known as the "compressor wheel" with a large gap (of roughly 1/8") between the side of the wheel and the compressor housing, whereas a standard gap for this type of turbo would be significantly smaller. The purpose of the photo is to make it appear KC Turbos sold an inferior or poor-quality product.

37. In truth, the photos shown in Example 6 are complete fabrications. They do not depict an actual part manufactured or sold by Plaintiff. Instead, the images show a fake/counterfeit part assembled by Defendant Barnes using a genuine KC Turbo compressor cover (bearing the "KC" mark) which Defendant Barnes obtained from a third party source.

38. Defendant Barnes then used this cover with other mismatched parts, assembling them in such a way as to make a complete unit that appeared to be extremely low-quality (due to the excessive gap between the compressor wheel and the compressor housing).

39. In fact, the turbocharger shown in Exhibit 6 was neither assembled by Plaintiff nor was it sold by Plaintiff a customer of Defendant Barnes. Instead, this turbocharger was a complete fabrication created solely by Defendant for the purpose of harming Plaintiff's reputation.

**FIRST CLAIM FOR RELIEF**
**False Advertising; 15 U.S.C. § 1125(a)**
<u>**Against All Defendants**</u>

40. Plaintiff incorporates by reference the factual allegations set forth in Paragraphs 1 through 38 above.

41. As reflected in Examples 1–6 above, Defendants have made multiple false and misleading statements of fact about Plaintiff's products and also about Defendants' products.

12

42. Plaintiff and Defendants are direct competitors selling the same or similar products to the same target market.

43. The false and misleading statements made by Defendants concerned the quality of the Parties' respective goods, and such statements materially misrepresent the nature, characteristics, qualities, or geographic origin of both Defendants' and Plaintiffs' goods, services, or commercial activities.

44. As reflected in Examples 1–6 above, the statements made by Defendants actually deceived or had the tendency to deceive a substantial segment of the target audience, and such deception was and is material, in that it is likely to influence the purchasing decision of consumers in the relevant target market.

45. As reflected in Examples 1–6 above, Defendants caused each of these statements to enter interstate commerce by publishing them on social media sites which were accessible to a nationwide audience.

46. Plaintiff has been or is likely to be injured as a result of Defendants' false statements.

47. Plaintiff has, in fact, suffered damages caused by Defendants' unlawful conduct in an amount to be proven at trial. Additionally, as a result of its actions, Defendants have earned additional profits which, in equity, they should be required to disgorge.

48. Pursuant to 15 U.S.C. § 1117(a) and subject to the principles of equity, Plaintiff is entitled to recover (1) Defendants' profits, (2) any damages sustained by the Plaintiff, and (3) the costs of the action.

49. To the extent Defendants created and used the counterfeit part shown in Example 6 above, Plaintiff is entitled to treble damages plus attorney's fees pursuant to 17 U.S.C. § 1117(b), and, alternatively, statutory damages in the amount of $200,000 or $2 million pursuant to 15 U.S.C. § 1117(c).

50. This matter is an exceptional case within the meaning of 15 U.S.C. § 1117(a), so the Court should award Plaintiffs its reasonable attorney's fees and costs incurred.

**SECOND CLAIM FOR RELIEF**
**Commercial Disparagement**
**<u>Against All Defendants</u>**

51.     Plaintiff incorporates by reference the factual allegations set forth in Paragraphs 1 through 38 above.

52.     As reflected in Examples 1–6 above, Defendants have intentionally published false and disparaging statements about the quality of Plaintiff's goods and services which have resulted in pecuniary loss in an amount to be proven at trial.

53.     Each of Defendants' statements concerning Plaintiff's products were material in that Defendants' statements actually deceived or had the tendency to deceive a substantial segment of its audience, and such deception was and is material, in that it is likely to influence the purchasing decision of consumers in the relevant target market.

54.     Defendants made the statements reflected in Examples 1–6 above with knowledge that such statements were materially false or, alternatively, with reckless disregard for their veracity.

55.     Among other things, at no time prior to publishing the statements reflected in Examples 1–6 did Defendant Barnes ever contact Plaintiff to ask whether the statements were accurate. Defendants intentionally avoided seeking any response from Plaintiff about the accuracy of these statements because Defendants knew the statements were not true and/or was not interested in determining whether they were true.

56.     Defendants' actions as described herein were intentional, malicious, and were specifically motivated to cause as much financial harm to Plaintiff as possible, in the hopes of diverting customers from Plaintiff to Defendant. As a result of Defendant's actions, Plaintiff is entitled to recover punitive damages in an amount sufficient to punish Defendant for its actions and to deter others from engaging in similar conduct.

//

//

//

### THIRD CLAIM FOR RELIEF
### Unfair Competition
### Against All Defendants

57. Plaintiff incorporates by reference the factual allegations set forth in Paragraphs 1 through 38 above.

58. As reflected in Examples 1–6 above, and by other similar conduct, Defendants have attempted to divert customers from Plaintiff using deceptive methods in such a manner as to constitute unfair competition under Arizona law. *See*, *e.g.*, *Great Am. Duck Races Inc. v. 18 Kangaroo Mfr. Inc.*, 398 F.Supp.3d 494, 508 (D.Ariz. 2019) ("Under Arizona law, 'the ultimate question' for unfair competition is always whether trade is being unfairly diverted.")

59. Among other things, Defendants specifically published the statements in Examples 1–6 above, and engaged in other similar conduct, for the express purpose of confusing Arizona consumers regarding both the quality and nature of Plaintiff's goods as well as the quality and nature of Defendants' goods. *ACT Grp. Inc. v. Hamlin*, No. CV-12-567-PHX-GMS, 2012 U.S. Dist. LEXIS 101446, 2012 WL 2976724, at *6 (D. Ariz. July 20, 2012) ("Under Arizona law, 'the universal test for unfair competition is whether the public is likely to be confused.'")

60. By engaging in the conduct described herein, Defendants have unfairly competed with Plaintiff in violation of Arizona law.

61. As a result, Plaintiff has suffered damages in an amount to be proven at trial.

### JURY DEMAND

Plaintiff demands a trial by jury as to all matters so triable.

//

//

**WHEREFORE**, Plaintiff KC Turbos, LLC prays for judgment against Defendants Turbo Charger Systems, Inc. and Kent R. Barnes, Jr. as follows:

    A.    For actual damages in an amount to be proven at trial;

    B.    For an order requiring Defendants to disgorge all profits wrongfully earned as a result of their unlawful conduct;

    C.    For punitive damages against Defendants in an amount to be proven at trial;

    D.    For an award of attorney's fees and costs incurred;

    E.    Any such other and further relief deemed appropriate by the Court.

DATED: May 13, 2025.

                                              **GINGRAS LAW OFFICE, PLLC**

                                              _/s/ David S. Gingras_
                                              David S. Gingras, Esq.
                                              **Gingras Law Office, PLLC**
                                              4802 E. Ray Road, #23-271
                                              Phoenix, AZ 85044
                                              Tel.: (480) 264-1400
                                              Fax: (480) 248-3196
                                              David@GingrasLaw.com

                                              Attorney for Plaintiff
                                              KC Turbos, LLC